IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JARON GEORGE & RACHEL E. | : | |
| GEORGE, | : | CIVIL ACTION |
|     Plaintiffs, | : | |
| | : | |
|     v. | : | No. 24-cv-2035 |
| | : | |
| STANLEY BLACK & DECKER, INC.; | : | |
| MTD PRODUCTS, INC., | : | |
|     Defendants. | : | |

## <u>MEMORANDUM OPINION</u>

**CRAIG M. STRAW**                                                     **January 26, 2026**
**UNITED STATES MAGISTRATE JUDGE**

Plaintiffs Jaron and Rachel George ("Plaintiffs") bring this subrogation action against Defendants Stanley Black & Decker, Inc. ("SBD") and MTD Products, Inc. ("MTD") for strict liability, negligence, and breach of warranty claims based on a riding lawnmower fire resulting in substantial damage to Plaintiffs' home.  Doc. 1-3, at 5-16.[1]  Before the Court is Defendants' Motion for Summary Judgment on all of Plaintiffs' claims, Defendants' Response in Opposition, and Plaintiffs' Reply.  Docs. 28, 29, 33, 34, 35 & 36.  Also before the Court is Defendants' Motion in Limine to exclude the testimony of one of Plaintiffs' expert witness, Michael Zazula ("Mr. Zazula"), Plaintiffs' Response in Opposition to that Motion, and Defendants' Reply. Docs. 37, 46, 48.

For the following reasons, Defendants' Motion in Limine to Exclude Mr. Zazula's testimony and opinion is hereby **GRANTED**.  Furthermore, without testimony or evidence of a defect in the lawnmower, Defendants' Motion for Summary Judgment is **GRANTED** on all of Plaintiffs' claims.

---

[1] All cites in this opinion are to the document and page numbers in the upper right corner as paginated in CM/ECF, not the pagination of the documents themselves.

# I. <u>FACTUAL BACKGROUND</u>

The facts in this case are largely undisputed.  The subject lawnmower is a Cub Cadet
LTX riding lawnmower, Model No. 13AX91AT010.  Doc. 1-3, at 7-9; Doc. 33, at 1.  MTD
manufactured the lawnmower before November 17, 2008 and it was sent to a retailer for the
2009 lawn mowing season.  Doc. 29-1, at 4.  Prior to production, MTD conducted extensive
testing of the Club Cadet, including Finite Element Analysis and Modal Analysis.  Doc. 29-8, at
10.  Additional testing included "field testing, dynamometer testing, 4-post shaker table testing,
ladder testing, figure 8 track testing, hot surface testing, grass browning testing, sound testing,
and heat testing."  <u>Id.</u>  If a Cub Cadet lawn tractor failed any tests or any issues are detected,
"design changes are made and the updated design is tested again."  <u>Id.</u>  Even after the design
testing phase, MTD conducts an end of the line test where the lawn tractor is evaluated to ensure
they are properly assembled, fully operational, and functioning according to safety and design
specifications.  <u>Id.</u>

SBD never sold or distributed the lawnmower at issue here, nor was SBD involved in
testing the design or warranty claims regarding the riding lawn tractors MTD sold in 2009.  Doc.
29-1, at 4, 7-8; Doc. 33, at 1; Doc. 34, at 1.

The lawnmower was powered by a twenty-horsepower single-cylinder Kohler engine,
and its engine exhaust system was below the white plastic hood at the front of the machine.  Doc.
29-8, at 9; Doc. 29-13, at 10-11.  Exhaust gases are diverted in the lawnmower as follows: first,
they go through the tubing and into the muffler cannister (parts 8 and 16);[2] second, they go
through a small opening on the cannister wall and into a circular deflector screwed into the
cannister wall (parts 16 and 10); and, finally, the exhaust goes through the deflector extension

---

[2] <u>See</u> diagram included in Defendants' Undisputed Statement of Facts.  Doc. 33, at 2.

opening and the gases are exhausted out and away from the muffler assembly (part 11). Doc. 29-6, at 22; Doc. 29-13, at 10-11; Doc. 33, at 2.

Plaintiffs did not originally purchase the lawnmower. Doc. 29-2, at 7, 19. Plaintiff Jaron George ("Mr. George") bought the lawnmower used based on an advertisement he saw in the newspaper or online. Id. at 7, 19. Mr. George testified at his deposition in February 2025 that he purchased the lawnmower used because of the cost "over ten years ago." Id. at 7, 10.

Mr. George did not receive the owner's manual from the original owner, and he did not download the manual online nor did he read the owner's manual before operating the lawnmower. Id. at 7. He just "learned how to start the machine." Id. The operator's manual states the operator should read all manual instructions and warnings on the lawnmower before operating. Doc. 29-14, at 4. Additionally, the manual provides the operator should not mow unusually tall or dry grass or dry leaves because the dry grass and leaves "may contact the engine exhaust and/or build up on the mower deck presenting a potential fire hazard." Doc. 29-8, at 5; Doc. 29-14, at 5. To further reduce fires, the manual warns the lawnmower should be kept free of grass, leaves, or other debris build up and oil, fuel, and fuel-soaked debris. Doc. 29-14, at 5. Additionally, the machine should be allowed to cool at least five (5) minutes before it is stored. Doc. 29-8, at 5; Doc. 29-14, at 6. The "Average Useful Life" ("AUL") of the Cub cadet lawnmower is seven (7) years or 270 hours of operation. Doc. 29-14, at 7. The manual states that at the end of the AUL an authorized service dealer should inspect the machine annually to make sure all the mechanical and safety systems are working properly and "[f]ailure to do so can result in accidents, injuries, or death." Id. The operator's manual contains a detailed maintenance schedule for the Cub Cadet. Doc. 29-14, at 20.

After the 2021 mowing season ended,[3] Mr. George covered the lawnmower with a tarp under a gazebo that was not a water-tight area.  Doc. 29-2, at 6-7.  Before the 2022 mowing season, Mr. George checked the oil and the gas levels of the lawnmower but never performed maintenance per the schedule in the operator's manual, never cleaned the lawnmower (including any obstruction to the cooling area), and never inspected the lawnmower.  Id. at 14-17.  If debris, including grass, leaves, etc., becomes trapped under the shroud of the lawnmower and is not cleared, the debris can become increasingly dry over time and is more easily combustible.  Doc. 29-8, at 11.

On May 10, 2022, between 12:00 and 1:00 p.m., Mr. George was on his lunch break and decided to mow the back of his lawn with his Cub Cadet lawnmower before his daughter came home from daycare.  Doc. 29-2, at 13.  After Mr. George finished mowing the lawn, he drove the lawnmower right in the garage without letting it cool off.  Id. at 18.  The lawnmower caught fire while it was sitting in Plaintiff's home garage.  Doc. 1-3, at 7.  Mr. George went outside his house when he heard tires screeching because "[p]eople noticed the fire and were stopping by" the house.  Doc. 29-2, at 20.  Mr. George unsuccessfully tried to put the fire out with a hose.  Id. The fire caused substantial damage to the home's garage, two bedrooms, attic, roof, and resulted in smoke and water damage.  Id. at 22.  The damage to Plaintiffs' real and personal property totaled $585,609.37.  Doc. 1-3, at 8.

## II.  PROCEDURAL HISTORY

On or about April 15, 2023, Plaintiffs commenced this action in the Court of Common Pleas of Philadelphia County.  Doc. 1, at 1; Doc. 1-3, at 2-5.  The matter was removed on May 13, 2024 pursuant to diversity jurisdiction under 28 U.S.C. § 1332.  Doc. 1, at 1.  Defendants

---

[3] Mr. George testified that generally he stopped mowing his lawn around November each year. Doc. 29-2, at 7.

filed an Answer on May 20, 2024 denying liability.  Doc. 5.  The parties then conducted

discovery which included expert reports and depositions.  Doc. 29, at 7.

The parties consented to proceed before a Magistrate Judge and the case was referred to

me.  Doc. 14.  On August 4, 2025, Defendants filed a Motion for Summary Judgment and Brief

in Support asking the Court to dismiss all of Plaintiffs' claims.  Docs. 28 & 29.[4]  Plaintiff filed a

Response in Opposition to Defendants' Motion for Summary Judgment and Brief in Support on

September 17, 2025.  Docs. 34-35.[5]  On October 10, 2025, Defendants filed a Reply in Support

of their Motion for Summary Judgment.  Doc. 36.

On October 17, 2025, Defendants filed a Motion in Limine to Exclude one of Plaintiff's

experts, Mr. Zazula.  Doc. 37.  Plaintiffs responded on November 7, 2025, and Defendants filed

a reply on November 11, 2025.  Docs. 46, 48.

The case is currently scheduled for a final pre-trial conference on January 29, 2026.  Doc.

58.[6]

## III.  <u>LEGAL STANDARD</u>

A court shall grant summary judgment if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A fact is material if it "'might impact the outcome of the suit under the

governing law. . . .'"  <u>Gonzalez v. Sec'y of Dep't of Homeland Sec.</u>, 678 F.3d 254, 261 (3d Cir.

2012) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  An issue is

---

[4] After Defendants were granted an extension of time, they filed their Statement of Undisputed
Material Facts on September 4, 2025.  Doc. 31-33.
[5] Plaintiffs also filed a Response to Defendants' Statement of Undisputed Facts.  Doc. 34.
[6] To date, the parties filed several other motions in limine and responses, as well as the required
pre-trial submissions.  Docs. 38-41, 45-47, 49-57.  The Court does not address the other motions
here because it is unnecessary to decide them in order to dispose of the pending motion for
summary judgment.

"genuine" if, after reviewing the evidence, a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.

The Court must view the facts and draw reasonable inferences in the light most favorable to the party opposing the motion for summary judgment.  Id. at 255.  But "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff."  Id. at 252.  A party opposing summary judgment must do more than rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

The moving party has the burden to establish the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Then the burden shifts to the non-moving party to come forward with "specific facts showing that there is a *genuine* issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original) (citing Fed. R. Civ. P. 56(e)).  This includes specific facts and affirmative evidence contradicting the facts and evidence the moving party offers.  Anderson, 477 U.S. at 256-57.  "[I]f the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to [its] case and on which [it] will bear the burden of proof at trial,' then summary judgment is appropriate for the moving party."  SodexoMAGIC LLC v. Drexel Univ., 24 F.4th 183, 204 (3d Cir. 2022) (alterations in original) (quoting Celotex, 477 U.S. at 322).

## IV.  **DISCUSSION**

Plaintiffs bring claims against SBD and MTD for strict liability, negligence, and breach of warranties.  Doc. 1-3, at 8-16.  In their complaint, they assert generally that the fire in the Cub Cadet lawnmower "was caused by a manufacturing and/or design defect within the lawnmower, which caused it to dangerously malfunction and start a fire."  Id. at 7.  They further allege that

"normal use caused the muffler and exhaustion deflector to deform, causing hot gases and excessive heat to impinge upon the plastic engine shroud, valve cover gasket and other ignitable materials, starting the fire which severely damaged the Plaintiffs' home." Id. at 8. The alleged defects included "design defects, manufacturing defects, and instructions for use and warning defects." Id. at 9. The complaint also avers that the lawnmower "'malfunctioned' as that term is used in Ducko v. Chrysler Motors Co., 639 A.2d 1204 (Pa. Super. 1994) . . . ." Id. at 10.

Plaintiffs' complaint does not contain further specifics regarding the particular defect in the lawn mower. Id. at 1-18. Instead, they rely on their expert—Mr. Zazula—who opined during discovery that Plaintiffs' lawnmower was in a defective condition because it incorporated a muffler cannister that had become distended and bowed over the years, and a gap had been created between the muffler and deflector, raising temperatures in the engine that resulted in the fire. Doc. 1-3, at 8; Doc. 29-10, at 18-20, 31, 33, 55; Doc. 33, at 5. Mr. Zazula does not point to any additional evidence of a defect at the time the lawnmower left the hands of Defendants but seems to suggest the distended muffler cannister itself was sufficient to prove a defect.

### A. **Summary judgment is granted to SBD as to all of Plaintiffs' claims.**

As a preliminary matter, Plaintiffs do not dispute Defendants' statement that SBD was not involved in the manufacturing or distribution of the lawnmower at issue. Doc. 29-1, at 7-8; Doc. 35-2, at 13. SBD did not acquire MTD until December 2021. Doc. 29-1, at 2. Therefore, no genuine issues of material fact exist regarding Plaintiffs' claims against SBD. See Fed. R. Civ. P. 56(a); Balczon v. Mach. Wholesalers Corp., 993 F. Supp. 900, 905 (W.D. Pa. Feb. 13, 1998) (finding defendant having no control or involvement in manufacture or design of alleged defective product could not be found strictly liable for injuries plaintiff sustained using product). Accordingly, summary judgment is granted in favor of SBD on all of Plaintiffs' claims.

See Celotex, 477 U.S. at 323.

Therefore, only Plaintiffs' claims against MTD remain.

**B.  Mr. Zazula's expert opinion and Defendants' Motion in Limine.**

Before addressing the merits of Defendants' motion for summary judgment as to Plaintiffs' claims against MTD, the Court will first consider Defendants' motion in limine to exclude Plaintiffs' expert, Mr. Zazula.

**1.  Necessity of Expert Testimony**

When a defect is alleged in a product liability case, expert testimony is generally required.  See Oddi v. Ford Motor Co., 234 F.3d 136, 159 (3d Cir. 2000).  "While there may be some instances when a defective condition can be established through non-expert evidence, that is not the case when the inner-workings of a machine unfamiliar to the public at large are at issue."  Pullins v. Stihl, No. 03-5343, 2006 WL 1390586, at *6 (E.D. Pa. May 16, 2006) (citing Oddi, 234 F.3d at 159).  Because of the complexities of the inner workings of the Cub Cadet lawnmower involved here—including the design of the muffler and the exhaust system—the Court finds expert testimony is required.  Id.

**2.  Legal Standard – Daubert.**

Defendants assert that Mr. Zazula's opinion should be precluded by Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).  Doc. 37-1, at 2.

Fed. R. Evid. 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

>    (c) the testimony is the product of reliable principles and methods; and
>
>    (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 has a liberal policy of admissibility. Dalton v. McCourt Elec. LLC, 112 F. Supp. 3d 320, 325 (E.D. Pa. 2015) (citations and quotations omitted). Nevertheless, pursuant to Rule 702, "trial courts must act as 'gatekeeper' and exercise discretion to preclude expert testimony that is unreliable, irrelevant, or unhelpful to the jury." Bavone v. Primal Vantage Co., Inc., 718 F. Supp. 3d 446, 453 (W.D. Pa. 2024) (citing Daubert, 509 U.S. at 597)). In this Circuit, the Court focuses on the "'trilogy of restrictions on expert testimony: qualifications, reliability, and fit.'" Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003) (quoting Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003)).

The qualification prong requires an expert witness to have "specialized knowledge" about the area of testimony. Betterbox Comms. Ltd. v. BB Techs., Inc., 300 F.3d 325, 327-28 (3d Cir. 2002). The specialized knowledge requirement is interpreted liberally, and "can be practical experience as well as academic training and credentials," but "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman. . . ." Waldolf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998) (citations and quotations omitted).

Next, reliability analyzes "'all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion.'" Hoefling v. U.S. Smokeless Tobacco Co., LLC, 576 F. Supp. 3d 262, 271 (E.D. Pa. 2021) (quoting ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 290 (3d Cir. 2012)). In other words, it requires expert testimony "be based on the 'methods and procedures of science' rather than on

'subjective belief or unsupported speculation;' the expert must have 'good grounds' for his or her belief." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (1994) (quoting Daubert, 509 U.S. at 589-90). The Third Circuit has "interpreted 'reliability' to mean that an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." Rossano v. Maxon, 659 F. Supp. 3d 559, 564 (E.D. Pa. 2023) (quoting In re Paoli, 35 F.3d 742). The district court is directed to consider the following important factors: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; (8) the non-judicial uses to which the method has been put." In re Paoli, 35 F.3d at 742, n.8.

Finally, the expert testimony must "fit," or assist the trier of fact. Oddi, 234 F.3d at 145 (citing In re: Paoli, 35 F.3d at 743). The concern is not whether a particular opinion has the "best foundation" or is "demonstrably correct." Oddi, 234 F.3d at 145-46. An opinion will "fit" the case if "it is based on valid reasoning and reliable methodology." Kannakeril v. Terminix Int'l Inc., 128 F.3d 802, 806 (3d Cir. 1997). Nonetheless, the court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." Oddi, 234 F.3d at 146. "[I]f there is too great a gap between the data and opinion proffered," the court can, in its discretion, exclude the opinion. Id. at 146, 154-55; General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) (citations omitted). Put another way, when assessing whether expert testimony "fits," the court asks, "whether [the] expert testimony . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving the

factual dispute." U.S. v. Schiff, 602 F.3d 152, 173 (3d Cir. 2010) (citing Daubert, 509 U.S. at 591) (additional quotations omitted).

### 3. Mr. Zazula's Opinion

Plaintiff offered expert testimony from two individuals concerning fire origin and fire causation. Doc. 33, at 5. One was Mr. Zazula. Mr. Zazula testified the muffler cannister of this Cub Cadet lawnmower became bowed and distended over its thirteen (13) years of use. Doc. 37-1, at 2; Doc. 37-7, at 42. Specifically, the muffler exhaust deflector was deformed from the muffler by approximately ¼ inch. Doc. 29-6, at 16, 20, 42. Mr. Zazula opined this gap allowed hot exhaust gases to escape from the muffler canister into the engine area, causing resultingly abnormally high temperatures and for debris and other combustible material in the area to ignite. Doc. 29-6, at 42; Doc. 37-1, at 2, 9; Doc. 37-7, at 42. A fire in the lawnmower resulted,[7] leading to the house fire and damage. Doc. 1-3, at 8; Doc. 29-10, at 18-20, 31, 33.

Mr. Zazula's report provides he had inspected 50 MTD tractor fires "which all have similar muffler outward deformation and separation or gap between the muffler and deflector." Doc. 29-6, at 43.[8] Mr. Zazula's report also stated "the fire would not have occurred if the deflector had not been deformed away from the front of the muffler." Doc. 29-6, at 42.

In his report, Mr. Zazula outlined the testing he conducted. Doc. 29-6, at 29-39. He performed temperature testing on an MTD manufactured "exemplar used Cub Cadet LTX 1040-Serial#1A312H60021) . . . similar to the subject 1045 tractor," besides a one-horsepower difference between the two, and represented the "two tractors utilize the same parts

---

[7] It is noted that during Mr. Zazula's deposition, there was a discussion about whether the proper term for this type of fire is a back-fire or an after-fire. Doc. 29-10, at 18-20. Mr. Zazula used the term after-fire. Doc. 29-10, at 18-21. This discrepancy does not affect the Court's disposition of the pending motion for summary judgment based on Plaintiffs' failure to identify any defect in the lawnmower.

[8] Defendants also filed a motion in limine to exclude this evidence. Doc. 38. The Court need not decide this motion.

components." Doc. 29-6, at 29. Temperature testing during a ten-minute period yielded the highest temperatures on the various thermal probes as follows: 644 degrees (placed at outlet exhaust stream), 689 degrees (placed above the deflector shield behind the muffler guard) 401 degrees (placed at top of muffler guard), 310 degrees (placed at top of muffler guard), and 726 degrees (placed at top of exhaust pipe coming off cylinder head), respectively. Doc. 29-6, at 36-39.

Importantly, Mr. Zazula testified about the lawnmower he used during his testing of the temperatures:

Q. Did you do the same testing with a heat shield that was not deformed?

A. We did not have a non deformed heat shield.

Q. Okay. And you did not have a non deformed muffler when you did your testing, correct?

A. We did not, no. We didn't put a non deformed muffler on.

Q. And you did not have a deflector cap that was attached against the surface of the muffler that did not have a gap on it; is that right?

*** 

A. No, we tested the Exemplar as it was purchased.

*** 

Q. But you didn't do any testing of an Exemplar with a muffler with a deflector cap in place against the muffler that had no gap on the top or the bottom or the side; true?

A. Correct.

Doc. 29-10, at 44.

Mr. Zazula opined that the Cub Cadet lawnmower was in "defective" condition and suggested that the ¼ inch gap on the muffler exhaust deflector on Plaintiffs' lawnmower was a design defect, manufacturing defect, or suffered from a failure to warn. Doc. 29-6, at 16, 20, 42;

Doc. 37-1, at 20; Doc. 37-11, at 55-56.  He does not, however, explain in any detail why he thought Plaintiffs' lawnmower had a defect—except again pointing to the distended/bowed muffler with a ¼ inch gap.  During his deposition, he talked more about the gap between the muffler and the deflector:

> Q.  But do you have any evidence of a manufacturing defect occurring in this case?
>
> A.  The fact that the muffler is distended and bowed and the big gap between the muffler and deflector, to me, that's a defect.  In other words, if you took this into MTD in that condition without the fire, and said, hey, is that normal or do you think that's unsafe, or could that be a problem?
>
> I believe, I would hope MTD would say that's not right.  That shouldn't have happened. You need a new muffler.
>
> Q.  My question, with respect, was there anything that occurred in the manufacturing process of this, Mr. George's mower, that would constitute a manufacturing defect, in your opinion?
>
> A.  Yes.
>
> The fact that the muffler is distended and bowed and we have a gap between the deflector and the muffler.  That should not be.  And, and that was further reiterated in - -  in the letter.
>
> Q.  Do you understand the difference between a manufacturing defect and a design defect?
>
> A.  I do.
>
> Q.  Okay.  What is a manufacturing defect?
>
> A.  Defect in the manufacturing or assembly of a component.
>
> Q.  So what about Mr. George's mower demonstrates a defect in the manufacturing or assembly of a component of the mower?
>
> A.  I've already answered this three times, at least.  I am going to give you the same answer again.

Doc. 29-10, at 55-56.

Significantly, Mr. Zazula admitted he is not a design engineer with respect to mufflers and exhaust systems and did not recommend in his report or in his testimony a specific alternative design change to the muffler and deflector cap.  Doc. 29-10, at 63-64.

**a.  Mr. Zazula's testing regarding fire causation is not reliable.**

The basic premise of Mr. Zazula's opinion is that the distention of the lawnmower's muffler cannister was deformed, creating a ¼ inch gap between it and the deflector, and this allowed hot exhaust gases to escape and caused higher temperatures and the ignition of combustible materials in the engine area.  Doc. 29-6, at 42; Doc. 37-1, at 2, 9, 18; Doc. 37-7, at 42.  He proffers that this condition was a design or manufacturing defect of the lawnmower.  Doc. 37-11, at 55-56.  Defendants argue that the expert testimony Mr. Zazula offers to support this premise is not admissible pursuant to Daubert.  Doc. 37-1, at 18.  This Court agrees that Mr. Zazula's report and opinion should not be considered.

The methodology Mr. Zazula used for investigation and testing is Chapter 4 of the National Fire Protection Association ("NFPA") 921, Guide for Fire and Explosion Investigations.  Doc. 29-6, at 6; Doc. 46-1, at 6.  The purpose of NFPA 921 "is to establish guidelines and recommendations for the safe and systemic investigation or analysis of fire and explosion incidents."  Doc. 46-3, at 2.  NFPA outlines the scientific method to be used, which includes, in part, to develop a hypothesis, here the fire's cause (inductive reasoning), and then to test the hypothesis (deductive reasoning).  Id. at 7.  By developing a hypothesis the expert attempts to "explain the phenomena . . . ." such as the cause of the fire and should be based upon "empirical data that the investigator has collected through observations and then developed into explanations for the event . . . based upon the investigator's knowledge, training, experience, and expertise."  Id.  Testing the hypothesis "should be designed to disprove, or refute, the

hypothesis" and after it is completed a final hypothesis can be selected.  Id. at 6-7.  The fire's cause should not be presumed until all data has been collected.  Id.

Mr. Zazula's report explained that he performed his testing on a "used" Cub Cadet LTX 1040 lawnmower like the subject 1045 tractor lawnmower, and both contained the same parts. Doc. 29-6, at 6-7, 29.  The temperature testing, which used thermal probes, at various parts of the used lawnmower on or near the muffler indicated temperatures ranging anywhere from approximately 400 degrees to the high of 726 degrees.  Doc. 29-6, at 36-39.  Significantly, however, Mr. Zazula admitted that he did not conduct any testing on a lawnmower without a "distended muffler" and a ¼ inch gap to try to prove or disprove whether the gap did, in fact, increase the temperatures in the engine area.  Doc. 29-10, at 44; Doc. 48, at 4.

Meanwhile, Defendants' expert, Mr. Adam Roy, performed this exact testing.  Doc. 37-1, at 18.  He found that "[p]rior testing performed by SBD[9] and [himself] on a similar riding mower had shown that a small gap between the muffler and the muffler deflector does not allow for the escape of the exhaust gases resulting in increased temperatures during operation . . . ."  Doc. 37-8, at 22; see also Doc. 37-8, at 30, 32.  Mr. Roy concluded that the most probable cause of the fire was "an ignition of combustible materials (ex. grass, debris, nesting materials, etc.) accumulated in the cooling areas of the engine by the hot engine or exhaust system component." Doc. 37-8, at 31.  Defendants' other expert—Eric Plamper—agreed with Mr. Roy's conclusion. Doc. 37-9, at 14-15 ("[t]he gap between the exhaust deflector and the muffler is not contributing to additional heating of the engine components" and "[e]xhaust gas will flow in the direction of least resistance.").[10]

_____

[9] The report defines SBD as SBD and MTD, collectively.  Doc. 37-8, at 3.
[10] Mr. Plamper's report also provides the muffler's heat shield on the lawnmower was bent inward, touching the muffler cannister, and that this damage could be a contributing factor in a fire.  Doc. 29-8, at 15; Doc. 29-12, at 27.  Mr. Roy also noted the damage to the heat shield could have led to increased operating temperatures in the lawnmower.  Doc. 29-11, at 24.

Importantly, Mr. Zazula could have fully tested his hypothesis, but he chose not to.  See In re Paoli, 35 F.3d at 742, n.8.  Thus, his one-sided opinion without additional testing he could have performed is not reliable.  Id. at 742.  Additionally, Defendants cite several other factors calling into question the reliability of Mr. Zazula's testing including, among others, the potential high rate of error and his failure to abide by NFPA guidelines.  See Doc. 37-1, at 19-20 (addressing In re Paoli factors); Calhoun, 350 F.3d at 321 (noting in assessing reliability court need not exclusively rely on list and may account for any other relevant factors, but list is "ample starting point.").

In their response, Plaintiffs focus on NFPA 921, stating it is not "meant to be a rigid book of rules," but they do not explain how or why Mr. Zazula did not conduct other readily available testing with a non-deformed muffler and no gap to determine whether the distended muffler and ¼ inch gap may have increased the temperatures in the lawnmower, possibly causing the fire. Doc. 46-1, at 9-11.  Rather, they argue that Mr. Zazula's opinion regarding the cause of the fire and the disagreements about this cause are jury questions.  Id. at 9-12.  Plaintiff's argument is unconvincing.  Without testing based on "the methods and procedures of science" instead of mere "subjective belief," Mr. Zazula's opinion that the muffler and ¼ inch gap (as a purported defect) caused the fire is unreliable and not admissible.  See In re Paoli, 35 F.3d at 742; Rossano, 659 F. Supp. 3d at 564.

### b. Mr. Zazula's expert testimony regarding fire causation does not "fit" the case or assist the trier of fact.

For similar reasons why Mr. Zazula's opinion regarding the cause of the fire is not reliable, Mr. Zazula's opinion does not "fit" the case or assist the trier of fact.  As explained before, it is not based on valid reasoning and reliable methodology.  See Kannakeril, 128 F.3d at 806.  In addition, Mr. Zazula's conclusion that the ¼ inch gap caused the rise in temperatures is

too speculative and subjective, considering he never conducted testing and compared temperatures in the engine of a lawnmower with a distended muffler and ¼ inch gap and one without.  This is especially so when two other experts who conducted the testing found no difference in the engine temperatures between the two.  See Doc. 37-8, at 22, 30, 32; Doc. 37-9, at 14-15.  As Defendants submit, "all that Zazula offers is his mere observation of the altered operating condition of a 13-year-old lawnmower that, in his view, might hasten the occurrence of a fire in the engine area."  Doc. 37-1, at 22.  This is far from the type of expert opinion evidence regarding fire causation that will aid the jury "in resolving the factual dispute" in this case.  See Schiff, 602 F.3d at 173 (quotations omitted).

Even assuming Mr. Zazula is qualified to opine about the cause of the fire in the lawnmower, for the reasons explained above, his opinion is unreliable and unhelpful to the jury and is therefore precluded based on Daubert.  See Daubert, 509 U.S. at 597.  Therefore, no hearing is necessary.  See Philadelphia. Tr. Co. v. Temple Univ. Hosp., Inc., No. 21-cv-3413, 2024 WL 5057595, at *6 (E.D. Pa. Dec. 9, 2024) (denying request for Daubert hearing because record before court was sufficient to decide admissibility issue) (citations omitted).

### c.  Mr. Zazula is also not qualified as an expert to provide testimony regarding the alleged defective condition of the lawnmower, and the Court will exclude his opinion on that issue.

Mr. Zazula proffered that the lawnmower at issue was defective because the distended muffler and the ¼ inch gap suggested a manufacturing defect or design defect.  Doc. 29-10, at 55-56.  When asked what evidence supported the existence of a manufacturing defect, Mr. Zazula pointed solely to the distended muffler and gap, stating if he took the muffler into MTD, MTD would say "that's not right."  Doc. 29-10, at 55.  When pressed to elaborate what specifically occurred during the manufacturing process to constitute a manufacturing defect, Mr. Zazula again pointed, without more, to the distended muffler and ¼ inch gap in the lawnmower

at issue.  Id.  Mr. Zazula offered no other specific evidence of any particular design defect.  Id. at 63.  Furthermore, Mr. Zazula represented during his deposition he was offering his opinion regarding "fire causation" and "mechanical issue[s] with the tractor," but not regarding defects. Id. at 64 (emphasis added).

Preliminarily, despite arguably being a fire causation expert, Mr. Zazula admitted he is not a design engineer regarding mufflers and exhaust systems, nor is he a warnings expert.  Doc. 29-10, at 63-64; see also Doc. 37-1, at 20.  Therefore, any of Mr. Zazula's testimony regarding the lawnmower's purported defects should not be considered.  See Calhoun, 350 F.3d at 322 (stating expert may be deemed qualified generally but may still lack qualifications to testify outside area of expertise).  This includes his opinion without more that the distended muffler and ¼ inch gap somehow was the result of the lawnmower's defective condition, including a design defect, manufacturing defect, or failure to warn.  Doc. 29-6, at 16, 20, 42; see also Surace v. Caterpiller. Inc., 111 F.3d 1039, 1055-56 (3d Cir. 1997) (finding electrical engineering expert was not qualified to opine on theory of liability "hinged on habituation" stemming from alarms on construction machinery, an area which expert had no training or experience, nor had "expert" participated in or read any literature on topic).

Even if Mr. Zazula was qualified to testify about the "defective condition" of the lawnmower, his testimony is not reliable.  While his report stated, in part, the muffler deformation and gap between the muffler and deflector "exacerbates the ignition of foreseeable combustible material . . . . when the hot exhaust are not properly vented out the side of the deflector as **designed [and] intended**," during his deposition he gave no evidence to support or further explain any design defect theory.  Doc. 29-10, at 63 (emphasis added).  Moreover, Mr. Zazula did not offer any alternative warnings or instructions that should have been provided in the lawnmower's operator's manual that were not provided.  Id.  Finally, Mr. Zazula offered no

evidence supporting a design defect except (as Defendants point out), "his mere observation of the altered operating condition of a 13-year-old lawnmower, that in his view, might hasten the occurrence of a fire in the engine area." Doc. 37-1, at 22. The Court agrees Mr. Zazula applied no methodology or procedures of science to support his opinion of a defect in the Cub Cabet at issue, and his opinion on any defect constitutes unreliable "subjective belief or unsupported speculation." In re Paoli, 35 F.3d at 742; Rossano, 659 F. Supp. 3d at 564.

Finally, and for similar reasons, the testimony is not helpful to the jury. Here, the testimony is not sufficiently tied to any of the facts to aid the jury in resolving whether MTD's lawnmower, in fact, suffered from a defective condition. See Schiff, 602 F.3d at 173. Again, at best, Mr. Zazula speculates what possibly caused the fire (in a case where there are several possible fire causes), without providing any specific evidence or testimony to support his opinion that the lawnmower was defective. As a result, the Court determines any of Mr. Zazula's testimony about any defective condition of the lawnmower should be excluded.[11]

### C. Summary Judgment is Granted to Defendant MTD on all of Plaintiffs' remaining claims.

Having decided Mr. Zazula's testimony should be excluded in its entirety, the Court now turns to Plaintiffs' remaining claims against MTD. These include the claims for strict liability, negligence, breach of express warranty, and breach of implied warranties of a particular purpose and merchantability.[12] The Court finds that summary judgment should be granted to MTD on all of Plaintiffs' remaining claims.

---

[11] Plaintiffs do not argue in their response Mr. Zazula's testimony about possible defects in the lawnmower should be admitted. They focus instead on his fire causation testimony. Doc. 46-1, at 1-14.

[12] Although Plaintiffs include breach of warranty claims in their original complaint, they do not further discuss these claims in their opposition to Defendants' motion for summary judgment, nor do they produce additional evidence to support the claims or argue they are entitled to relief on those grounds. Doc. 35-2, at 3-15. As a result, the Court grants summary judgment in favor

1.  **Plaintiffs cannot establish any of their strict liability claims against MTD because they have not produced a genuine issue of material fact that the lawnmower at issue had a defect.**

Section 402(A) of the Restatement (Second) of Torts governs strict liability claims brought under Pennsylvania law.  See Keen v. C.R. Bard, Inc., 480 F. Supp. 3d 624, 634 (E.D. Pa. 2020).  Plaintiff may recover under a strict liability theory "if his or her injury was caused by a product in 'a defective condition unreasonably dangerous to the user or consumer.'"  Id. (quoting Restatement (Second) of Torts § 402A).  The plaintiff must prove the "product was defective, the defect existed when it left the defendant's hands, and the defect caused the harm." Igwe v. Skaggs, 258 F. Supp. 3d 596, 609 (citations omitted).  This is true whether the plaintiff brings a manufacturing defect, design defect, or failure to warn defect.  Bavone, 718 F. Supp. 3d at 455 (citing Igwe, 258 F. Supp. 3d at 609).  Again, to prevail on any of these claims it is Plaintiff's burden to first demonstrate that a product is defective.  See, e.g., Chandler v. L'Oreal USA, Inc., 340 F. Supp. 3d 551, 561 (W.D. Pa. 2018), aff'd, 774 Fed. Appx. 752 (3d Cir. 2019) (stating to prevail on strict liability, negligence, and breach of implied warranty claim, plaintiff had burden to first demonstrate hair relaxer product was defective).  Generally, whether a product is in defective condition is ordinarily submitted to the trier of fact; "the question is removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue."  Id. at 564 (citing Tincher v. Omega Flex, Inc., 104 A.3d 328, 423 (Pa. 2014) (additional citations omitted)).

In this case, Plaintiffs failed to present a genuine issue of material fact the lawnmower at issue contained a defect required to establish any of Plaintiffs' strict liability claims.  See

---

of Defendants on Plaintiffs' breach of express warranty and implied warranty claims.  See Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 511 (3d Cir. 1994) (stating non-moving party "cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact").

Bavone, 718 F. Supp. 3d at 455; Celotex, 477 U.S. at 323.  Because Mr. Zazula's testimony and opinion has been excluded, Plaintiffs have not presented any evidence **at all** that the lawnmower was defective, specifically that it suffered from a manufacturing defect, design defect or failure to warn defect claim.[13]  See, e.g., Flanagan v. martFIVE, LLC, 259 F. Supp. 3d 316, 320 (W.D. Pa. 2017) (granting defendants' motion for summary judgment on plaintiff's manufacturing defect claims when plaintiff did not adduce record evidence cane had manufacturing defect that causing plaintiff's fall because cane was in good working order without visible defects when first used and no expert testimony demonstrated manufacturing defect caused fall or product deviated from intended design).  Here, the Court finds that reasonable minds could not differ about whether Plaintiffs have produced sufficient evidence to demonstrate the lawnmower was in a defective condition.  See Chandler, 340 F. Supp. 3d at 561.[14]

Moreover, Plaintiffs assert in their response to the motion for summary judgment that they are entitled to relief on their Pennsylvania design defect claims based on the consumer expectation and the risk utility tests.  Doc. 35-2, at 11; see Sujauddin v. Berger Bldg. Prods., Inc., 19-cv-0876, 2023 WL 3819363, at *3 (E.D. Pa. June 5, 2023); Dorshimer v. Zonar Sys., Inc., 145 F. Supp. 3d 339, 352 (M.D. Pa. 2015) (noting in Pennsylvania cause of action in strict

[13] Moreover, Plaintiffs cannot demonstrate a genuine issue of material fact as to their strict liability failure to warn claim.  Plaintiffs have not shown the absence or inadequacy of the lawnmower's warnings was the proximate cause of the fire.  See, e.g., Wright v. Ryobi Techs., Inc., 175 F. Supp. 3d 439, 454-55 (E.D. Pa. 2016) (citations omitted).  The record indicates the lawnmower here included several warnings about operation and how to properly maintain it—in the user manual and on the lawnmower itself—which Plaintiff Mr. George admits he did not read and generally ignored.  Doc. 29-2, at 7, 10-11, 16; see also Chandler, 340 F. Supp. 3d at 562 (finding no genuine issue of material fact for failure to warn claim when jury could not conclude warnings provided on outside of hair relaxer box were inadequate, and plaintiff read warnings/instructions inside box, but conceded that she ignored them).
[14] Plaintiff's second expert, Mr. Raymond Anthony, primarily discussed the fire's origin.  See generally Doc. 29-5, at 2-57.  Mr. Anthony notes that Mr. Zazula's report provides "that a malfunction or defect was present within the tractor" and states "this hypothesis cannot be disproved."  Id. at 56.  For the reasons previously discussed, however, Mr. Zazula's opinion has been excluded.  Moreover, Mr. Anthony does not opine himself that the subject lawnmower

products liability may be met through either consumer expectation test or risk utility test).  The

consumer expectation test provides "a product is defective if it poses a danger that is unknowable

and unacceptable to the average or ordinary consumer."  <u>Tincher</u>, 104 A.3d at 394.  This test,

however, has "theoretical and practical limitations" when it applies to "products of relatively

complex design" because the danger of the product could be "vague" or "outside the ordinary

consumer's contemplation."  <u>Id.</u> at 396 (citation omitted).  Thus, trial courts do not apply the

consumer expectations test in cases involving complex machinery.  <u>Id.</u>; <u>see e.g.</u>, <u>Yazdani v.

BMW of North Am., LLC</u>, 188 F. Supp. 3d 486, 493, n.3 (E.D. Pa. 2016) (granting defendant's

motion in limine because "fire hazard posed by motorcycle's alleged defective design [wa]s

beyond the everyday understanding of . . . ordinary consumer" with an air-cooled motorcycle

engine) (citing <u>Tincher</u>, 104 A.3d at 388)).

      In this case, the Court finds the alleged defect in the muffler and exhaust system of the

Cub Cadet lawnmower is beyond the scope of the average or ordinary consumer.  <u>Tincher</u>, 104

A.3d at 394.  An average consumer does not understand the inner workings of the exhaust

system of the lawnmower or how a small gap might affect the temperature in the engine.  <u>Id.</u> at

388.  Accordingly, the consumer expectation test does not apply to the facts of this case.

      "The risk-utility test is a cost-benefit analysis" and provides a product is defective under

that standard "if a reasonable person would conclude that the probability and seriousness of the

harm caused by the product outweigh the burden or costs of taking precautions."  <u>Tincher</u>, 104

A.3d at 397.  When assessing the "risk-utility" test, the following factors to consider are: "(1)

The usefulness and desirability of the product—its utility to the user and the public as a whole[;]

(2) The safety aspects of the product—the likelihood it will cause injury, and the probable

seriousness of the injury[;] (3) The availability of a substitute product which would meet the

contained any defects.

same need and not be as unsafe[;] (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility[;] (5) The user's ability to avoid danger by the exercise of care in the use of the product; (6) The user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions[;] (7) The feasibility, on the part of manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance." McPeak v. Direct Outdoor Prods., LLC, No. 19-cv-3719, 2022 WL 4369966, at *4 (E.D. Pa. Sept. 20, 2022).

Plaintiffs allege that in support of the risk-utility test they will "present expert testimony to establish that a feasible, safter alternative design existed" and "if used, the safer design would have prevented the [lawnmower] from bursting into flames suddenly and without warning . . . ." Doc. 35-2, at 11.  They contend the "[a] jury could . . . conclude that the unit was defective under the Risk Utility test because the possibility and seriousness of the harm outweighed the burden or cost of making the product safe." Id. at 5.  Plaintiffs do not otherwise explain how the risk-utility test is met in this case or discuss any of the circumstantial factors or cite to other evidence showing how the risk-utility test applies in this case.  Because Plaintiffs cannot demonstrate a genuine issue of material fact and instead just rely on general allegations and statements that the risk utility test is met, summary judgment is appropriately granted to Defendant on this ground. See Saldana, 260 F.3d at 232 (to successfully oppose summary judgment party must do more than rest upon mere allegations or vague statements).

Plaintiffs' other grounds for relief regarding their strict liability claims lack merit. Plaintiffs argue they can maintain a product liability claims under a malfunction theory.  Under that theory, a plaintiff may prove the defect's existence by circumstantial evidence of a

malfunction and must produce (1) "evidence of the occurrence of a malfunction; (2) evidence eliminating abnormal use; and (3) evidence eliminating "reasonable[] secondary causes for the malfunction." Dalton v. McCourt Elec. LLC, 112 F. Supp. 3d 322, 327-28 (E.D. Pa. 2015) (quotations and citations omitted). Plaintiffs assert the fact the fire started in the lawnmower presents evidence of a malfunction, and Mr. Zazula will establish evidence eliminating reasonable secondary causes. Doc. 35-2, at 14.

Plaintiffs cannot prove liability under the malfunction theory. As explained above, the Court has already excluded Mr. Zazula's expert testimony. Even if the Court considered Mr. Zazula's testimony and opinion, Plaintiff cannot eliminate all secondary causes for any malfunction. Plaintiff admitted he had not properly maintained the lawnmower as required by the maintenance manual and had not conducted any tune-up the year of the fire. Doc. 29-2, at 9-10. During the year prior to the incident, Plaintiff only filled the oil and gas levels in the lawnmower before he stored it under a gazebo covered with a tarp. Id. at 7. Plaintiff also conceded he never properly cleaned the lawnmower—including any obstruction to the cooling area—and never inspected it when using it, either. Doc. 29-2, at 15-17. Moreover, the lawnmower at the time of the accident was approximately 13-years old, well past the AUL span of the product. Doc. 29-2, at 7, 10-11; Doc. 29-14, at 7. The manual required an authorized service dealer to inspect the lawnmower annually after its AUL span. Doc. 29-14, at 7. This did not occur here. Accordingly, Plaintiffs cannot eliminate reasonable secondary causes for the malfunction and relief under this theory fails.

Finally, Plaintiffs' negligent consumer product design claim is meritless. Doc. 35-2, at 11-12. Plaintiffs argue their "negligence claim is supported by expert testimony from a mechanical expert who examined the product and concluded that a key component deformed over time under ordinary and foreseeable use." Id. at 11-12. As previously discussed, the Court

finds Mr. Zazula's testimony unreliable and will exclude it.  See supra pp. 8-19.  Thus, Plaintiffs

cannot establish an essential element of their negligent design defect claim—that the product was

defective.  See Warnick v. NMC Wollard, Inc., 512 F. Supp. 2d 318, 322-23 (W.D. Pa. 2007)

(threshold inquiry in all product liability cases is if defect exists, whether claim sounds in strict

liability or negligence) (citations omitted).  Once again, even if accepted, testimony that

Plaintiffs' lawnmower, which is approximately thirteen (13) years old, with a distended muffler

and a ¼ inch gap near the muffler deflector is not evidence, by itself, the product was defective.

See Westfield Ins. v. Detroit Diesel Corp., No. 10-cv-100, 2012 WL 1611311, at *7 (W.D. Pa.

May 8, 2012) (holding failure of tour bus turbo charger engine with 540,000 miles on it was

insufficient to establish product was defective at time it left hands of Defendants).  Therefore,

Plaintiffs' negligent consumer product design claim fails.

## V.  CONCLUSION

For the foregoing reasons, any testimony and report from Plaintiffs' expert Michael

Zazula should be excluded.  Accordingly, Defendants' Motion in Limine to Exclude Plaintiffs'

Expert Michael Zazula (Doc. 37) is hereby **GRANTED**.

Summary judgment is granted to SBD on all claims.  Additionally, the Court finds that no

genuine issues of material fact exist on the record regarding Plaintiffs' claims against MTD for

strict liability, negligent design defect claim, or their breach of warranty claims.  Therefore,

Defendants' Motion for Summary Judgment (Docs. 28, 29, 33) is also **GRANTED**.  Plaintiffs'

claims in their entirety are dismissed with prejudice.  An appropriate order follows.

BY THE COURT:

/s/ Craig M. Straw
CRAIG M. STRAW
U.S. Magistrate Judge